T.C. Memo. 2011-81

UNITED STATES TAX COURT

PAMELA B. RUSSELL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24413-05.                    Filed April 6, 2011.

<u>Mark E. Cedrone</u>, for petitioner.

<u>Jack T. Anagnostis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined that petitioner was
liable for a deficiency and additions to tax for failure to file
timely pursuant to section 6651(a)(1) and failure to pay timely
pursuant to section 6651(a)(2) for her 2001 tax year.[1]

---

[1]All section references are to the Internal Revenue Code in
(continued...)

After concessions,[2] the sole issue remaining for decision is whether petitioner's failures to file timely and pay timely were justified by reasonable cause and not due to willful neglect.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated in this opinion by reference and are found accordingly. At the time she filed her petition, petitioner resided in Pennsylvania.

Petitioner is a medical doctor in the neonatology unit at the Children's Hospital of Philadelphia, where she worked as an employee for all relevant periods. Petitioner is and was married to Bertram Royce Russell (Mr. Russell) at all relevant times. Petitioner and Mr. Russell (hereinafter sometimes referred to as the couple) maintained separate finances and separate checking accounts. Petitioner was responsible for handling the family's day-to-day living expenses, and Mr. Russell took primary responsibility for their children's tuition and college savings, the couple's retirement savings, and all tax matters. During the periods in issue Mr. Russell owned an interest in Basement

---

[1](...continued)
effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2]Petitioner does not dispute the deficiency.

Doctor, Inc. (Basement Doctor), a business that waterproofed basements.

During the late 1980s or early 1990s, Mr. Russell introduced petitioner to Jay Bagdis (Mr. Bagdis).  Mr. Russell told petitioner that Mr. Bagdis was the couple's financial adviser and tax attorney.  Mr. Russell interacted with Mr. Bagdis more than petitioner did because of the couple's division of labor regarding finances, but petitioner did meet Mr. Bagdis on a number of occasions over the years.

The Internal Revenue Service (IRS) examined the couple's returns[3] at some point after Mr. Bagdis had assumed his role as their financial adviser and tax attorney.  Mr. Bagdis and his law firm represented petitioner and Mr. Russell during that examination.  The examination was resolved in the couple's favor, and they received a refund from the IRS.  The successful resolution of the IRS examination by Mr. Bagdis and his firm gave petitioner confidence in Mr. Bagdis, leading her to believe that he was extremely competent.  Petitioner relied on Mr. Bagdis for tax advice.

Mr. Bagdis advised petitioner during early 1999 that she should submit a Form W-4, Employee's Withholding Allowance

_____

[3]The record does not reveal the year or years covered by this examination, but it does indicate that Mr. Bagdis' firm filed an amended return on behalf of the couple for their 1994 tax year.

Certificate, to Children's Hospital claiming that she was exempt from income tax withholding for 1999. In accordance with Mr. Bagdis' advice, petitioner signed a Form W-4 claiming the exemption on January 27, 1999. Mr. Bagdis' law firm submitted the Form W-4 to Children's Hospital, accompanied by a letter from the firm.

Petitioner was required to file a Federal income tax return for 1999. However, petitioner did not timely file her 1999 return because Mr. Bagdis advised her that her husband's business, Basement Doctor, had sustained significant losses during 1999 that would offset the couple's income from petitioner's salary, but that those losses needed to be calculated exactly before the couple filed their return. Petitioner followed Mr. Bagdis' advice and did not timely file her 1999 tax return. On February 21, 2001, respondent sent a delinquency notice to petitioner, informing her that respondent's records showed she had not filed a tax return for 1999 and asking her to file that return. The couple filed a joint tax return for their 1999 tax year on October 31, 2001. On their 1999 return, the couple reported $153,786 in wages and salary income, but the couple reported a loss of $100,000 from Mr. Russell's business. The couple reported an overpayment of $16,289 for 1999, and they received a refund of $16,417.57 on December 24, 2001.

Substantially the same series of events took place with regard to the couple's 2000 tax return. Mr. Bagdis again advised petitioner that she should wait until he had every detail of the return correct, including exact figures for the losses from Basement Doctor. Respondent again sent delinquency notices to petitioner, dated July 8 and September 2, 2002, informing petitioner that respondent's records showed she had not filed a tax return for 2000 and asking her to file that return. The couple filed a joint tax return for their 2000 tax year on September 13, 2002. On that return the couple reported $163,793 in wages and salary income and another $100,000 loss from Basement Doctor. The couple again reported an overpayment and received a refund of $2,696.

Petitioner likewise was required to file a return for 2001, the year in issue, but was again advised by Mr. Bagdis not to file her return until he had calculated the exact losses from her husband's business. Petitioner understood that Basement Doctor was divided into three "parts" by State, one part each in Delaware, Pennsylvania, and New Jersey. Mr. Bagdis explained to petitioner that Basement Doctor's 1999 losses were from the Pennsylvania business, the 2000 losses were from the Delaware business, and the 2001 losses would be from the New Jersey business. Mr. Bagdis told petitioner that the losses from

Basement Doctor's New Jersey business would be even greater than the losses from Pennsylvania and Delaware. Petitioner knew that her 2001 return was due on April 15, 2002, but, in accordance with Mr. Bagdis' instructions, petitioner did not file her 2001 return when it was due.

On January 15, 2002, petitioner signed and submitted a Form W-4 to Children's Hospital, reporting two allowances and not claiming that she was exempt from Federal tax withholding for 2002. Petitioner understood that she was no longer exempt from withholding because her husband no longer had an interest in Basement Doctor, and the couple would not have any losses to offset petitioner's salary for 2002.

Respondent sent delinquency notices to the couple on April 28 and June 23, 2003, informing them that respondent's records indicated that they had not filed a tax return for 2001 and asking them to file that return.

At some point during October 2004, IRS agents visited petitioner while she was working at Children's Hospital to serve her with a subpoena for records. Around the same time, petitioner understood that the IRS had also seized files from Mr. Bagdis' offices. After she received a subpoena from the IRS and learned of the IRS raid on Mr. Bagdis' offices, she became very concerned and asked to meet with Mr. Bagdis as soon as possible.

When petitioner met with Mr. Bagdis, she received the same explanation from him:  he expected that large losses from Basement Doctor would offset her salary income from 2001 and that she should wait to file her return until Mr. Bagdis could calculate the exact numbers.  Petitioner continued to rely on Mr. Bagdis' advice.

On or about April 6, 2005, Mr. Bagdis sent petitioner and her husband a letter regarding their 2001, 2002, and 2003 taxes.  In the letter, Mr. Bagdis informed the couple that he no longer had access to many of the couple's records because his files had been seized by Federal agents.  However, he told the couple that he had nevertheless attached "pro forma" Forms 1040, U.S. Individual Income Tax Return, for the couple as married, filing separately.  In the letter, Mr. Bagdis explained that the "pro forma" returns were based on "limited historical data" available in some computer files to which he still had access, as well as some new information supplied by the couple.  Mr. Bagdis informed the couple that although the "pro forma" returns he had prepared were for the couple filing separately, they probably would have a lower tax liability if they filed a joint return.  Specifically, he told the couple that if they filed a joint return for 2001, the Basement Doctor losses would offset petitioner's salary income and result in a tax liability of close to zero.  He advised the couple:

> Again, with a refund, there are no real consequences to filing late, except that you lose interest on the refund amount, which only starts to accrue after a return is filed. You can always later file a joint return, but once a joint return is filed, it is more difficult to undo, so I projected a "worst case" of Pam filing separately.

The couple had filed joint returns for 1999 and 2000.

Petitioner has no recollection of ever seeing the "pro forma" returns referred to in Mr. Bagdis' letter, nor does she recall reading Mr. Bagdis' letter dated April 6, 2005. There is no evidence in the record that petitioner ever received the "pro forma" returns or that they were actually attached to Mr. Bagdis' letter dated April 6, 2005.

On or about April 25, 2005, respondent sent petitioner a letter informing her that respondent still had not received her income tax return for 2001 and providing petitioner with respondent's calculation of petitioner's income tax liability for 2001. Upon receipt, petitioner or Mr. Russell delivered the letter to Mr. Bagdis. At that time Mr. Bagdis again explained to petitioner that he was waiting until all of the losses from Basement Doctor had been captured.

Mr. Bagdis wrote a letter responding to the IRS' letter for petitioner, which petitioner then typed on her stationery and sent to respondent on or about May 24, 2005. The letter petitioner signed reported that most of her records had been seized by Federal agents when they raided Mr. Bagdis' offices. The letter explained that petitioner was therefore unable to

access the records related to her 2001 tax year and that "there is no further action that can be taken at this time."

Petitioner apparently received at least one more letter from the IRS, dated August 30, 2005, which also included a proposed tax return for 2001. Petitioner again responded to the IRS with a letter drafted by Mr. Bagdis and stating that petitioner did not have access to the records she needed to prepare her 2001 tax return since those records had been seized. The letter objected to the IRS' proposed tax return because it did not include the losses from Basement Doctor, which the letter stated were expected to offset petitioner's remaining income and reduce her tax obligation to "near zero."

Respondent subsequently issued petitioner a notice of deficiency for her 2001 tax year, dated October 5, 2005. After receiving the notice of deficiency, petitioner again consulted Mr. Bagdis, who filed a petition with this Court on her behalf.

Sometime during December 2005, petitioner received a call from John Pease, an attorney involved in the investigation of Mr. Bagdis, who advised her that she should retain separate counsel and should not be relying on Mr. Bagdis.[4] As a result

---

[4]Petitioner identified John Pease as the attorney who was then representing Mr. Russell in the investigation. It appears that John Pease was actually the Assistant U.S. Attorney involved in the investigation.

of the conversation with John Pease, petitioner began to doubt Mr. Bagdis' advice, and she did retain separate counsel, Thomas Bergstrom (Mr. Bergstrom). From the time around December 2005 when she first spoke with Mr. Bergstrom, petitioner had no further interactions with Mr. Bagdis except to request that he withdraw as her attorney.

Petitioner first met with Mr. Bergstrom, a criminal defense attorney, during January 2006. At the time petitioner retained Mr. Bergstrom, both Mr. Bagdis and Mr. Russell were under criminal investigation by the U.S. Attorney's Office for the Eastern District of Pennsylvania. Mr. Bergstrom was concerned that the investigation might also expand to include petitioner. Over the next 11 months, Mr. Bergstrom met with the U.S. Attorney's Office on several occasions, and he hired a certified public accountant to prepare a tax return for petitioner's 2001 tax year. It took 11 months for Mr. Bergstrom, the certified public accountant, and petitioner to calculate and pay petitioner's 2001 tax liability.

Consistent with calculations made by that accountant, Mr. Bergstrom mailed the IRS a letter on November 27, 2006, enclosing a check from petitioner in payment of her 2001 tax liability. However, petitioner did not submit an income tax return at that time.

It was not until November 2007, after receiving a letter from the U.S. Attorney's Office informing Mr. Bergstrom that petitioner would not be prosecuted for a criminal offense, that Mr. Bergstrom felt comfortable submitting drafts of petitioner's tax returns to an IRS criminal agent for inspection. In accordance with a conversation he had with an IRS criminal agent, Mr. Bergstrom submitted the Forms 1040 to the IRS criminal agent as unsigned "drafts" for the IRS to examine. Those Forms 1040 indicated that petitioner was married, filing separately. Mr. Bergstrom understood that the IRS would inspect the draft returns and then let Mr. Bergstrom know whether they agreed that the draft returns were accurate. It was only several years later that petitioner actually signed the "draft" Forms 1040. Pursuant to an agreement with respondent, at that time petitioner included an asterisk on those forms noting that were effective as of November 2006.

                              OPINION

Section 6651(a)(1) imposes an addition to tax for the failure to file a required return timely unless the taxpayer can establish that such failure was due to "reasonable cause and not due to willful neglect". United States v. Boyle, 469 U.S. 241, 245 (1985). The Commissioner bears the initial burden of production to introduce evidence that the return was filed late. See sec. 7491(c). The taxpayer then bears the burden of proving

that the late filing was due to reasonable cause and not willful neglect. United States v. Boyle, supra at 245; Higbee v. Commissioner, 116 T.C. 438, 447 (2001). Because the parties agree that petitioner's 2001 tax return was filed untimely, petitioner must prove that the untimely filing was due to reasonable cause and not willful neglect. See Rule 142(a); Higbee v. Commissioner, supra at 446-447.

Courts have consistently held that the standard to be applied under section 6651(a) is one of "ordinary business care and prudence", as required by section 301.6651-1(c)(1), Proced. & Admin. Regs. United States v. Boyle, supra at 246 n.4. Although the statute speaks of willful neglect, no finding of willfulness is necessary to hold a taxpayer liable for the addition to tax. Id. Rather, taxpayers must prove that their failure to file on time did not result from carelessness, reckless indifference, or intentional failure. Id. Although respondent contends both that petitioner displayed willful neglect and that she lacked reasonable cause when she failed to file her tax return timely, if we find that petitioner did not prove she had reasonable cause for filing late, we need not consider whether she acted with willful neglect. Accordingly, we will first consider whether petitioner proved that her failure to file timely was the result of reasonable cause.

Courts have frequently held that a taxpayer's reasonable reliance on the advice of an accountant or attorney regarding a question of law, even when such advice turns out to be mistaken, constitutes "reasonable cause" and is consistent with "ordinary business care and prudence". Id. at 250 (and cases cited threat). Requiring taxpayers to challenge their attorneys or seek second opinions would negate the purpose of relying on an expert, and such actions are not necessary under the standard of "ordinary business care and prudence". Id. at 251.

We have divided into three categories the holdings in cases considering whether reliance on an expert's advice that no return had to be filed constituted reasonable cause.[5] See Estate of La Meres v. Commissioner, 98 T.C. 294, 315-317 (1992). In the first category of cases, courts held that the section 6651(a)(1) addition applied because some element of the reliance defense was missing: The taxpayers did not fully disclose all relevant information to the expert, did not prove that the expert actually gave the advice upon which they claimed to rely, or failed to establish that the individual giving advice was actually an

---

[5]The situation in United States v. Boyle, 469 U.S. 241 (1985), constitutes a fourth and separate category: where the taxpayer relied on the agent to actually file the return. The Supreme Court held that the duty to file the return is nondelegable and reliance on an agent to file the return is not reasonable cause for failing to file it on time. Id. at 252.

expert upon whose advice it was reasonable to rely.  See id. at 315-316 (and cases cited thereat).

In the second category of cases, the taxpayers claimed that they did not timely file returns because they relied on an expert's advice that no additions to tax would be due because they had no tax liability.  The expert in such cases never told the taxpayers they were not required to file a return, nor did the expert provide an incorrect return date.  In such cases, courts have held that the failure to file was not due to reasonable cause because the expert upon whose advice the taxpayers claimed to rely did not actually tell them that they did not have to file a return.  See id. at 316 (and cases cited thereat).

Finally, in the third category of cases, courts have found that reliance on an expert was reasonable cause for failing to file timely a return because the taxpayers made full disclosure to the expert, relied in good faith on the expert's advice, and did not otherwise know that the return was due.  See id. at 317 (and cases cited thereat).  The third category includes both cases in which the expert advised that the taxpayers were not required to file a return and cases in which the expert provided erroneous advice as to the date the return was due.  Id. at 317-318 (and cases cited thereat).  The third category is distinct from the first two because in the first two categories the

taxpayers' claimed reliance either was not proven or was not reasonable. Id.

Petitioner has advanced several different contentions that her failure to file timely was due to reasonable cause, which we will address in turn.

I.  Whether Petitioner Was Advised That Submitting a Return That Was Not Completely Accurate Would Be Fraudulent and Perjurious

Petitioner's primary contention is unique. She testified that Mr. Bagdis advised her to wait until Mr. Russell's business losses were calculated before filing her tax returns because filing a return that was not correct in every detail would be fraudulent and signing such a return would constitute perjury. Petitioner maintains that, following his advice, she filed late returns for 1999 and 2000 because Mr. Bagdis and Mr. Russell did not have exact numbers for Basement Doctor's losses at the time her income tax returns were due. Likewise, she did not file her income tax return for 2001 on April 15, 2002, even though she knew it was due on that date.

Petitioner contends that she should not be liable for the section 6651(a)(1) addition to tax because she exercised ordinary business care and prudence in filing a late income tax return on her attorney's advice that filing a return that was not correct in every detail would be perjurious. We need not accept a taxpayer's testimony when it is improbable, self-serving, and

uncorroborated by other evidence.  See, e.g., <u>Baird v. Commissioner</u>, 438 F.2d 490, 493 (3d Cir. 1970), vacating T.C. Memo. 1969-67; <u>Shea v. Commissioner</u>, 112 T.C. 183, 189 (1999); <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).  For the reasons explained below, we decline to accept petitioner's testimony that Mr. Bagdis advised her that she had to wait for the Basement Doctor losses to be calculated before filing her return so as to avoid committing fraud and perjury.

According to petitioner's testimony, Mr. Bagdis gave her such advice on at least three occasions.  The first time was around the time her 1999 tax return was due.  Mr. Bagdis allegedly repeated the same advice during a meeting with petitioner soon after she had received a subpoena from the IRS during October 2004.  The final meeting during which petitioner claims Mr. Bagdis gave her such advice occurred sometime shortly after she received a letter from the IRS dated April 25, 2005.

However, the only document among the stipulated exhibits that is signed by Mr. Bagdis fails to corroborate petitioner's testimony and comes close to contradicting it.  Mr. Bagdis sent petitioner and Mr. Russell a letter dated April 6, 2005, in which he told the couple that he had prepared "pro forma" returns for their 2001 tax year with petitioner filing separately from her husband.  According to the letter, the "pro forma" returns were not based on complete data but were rather based on what limited

information was available after Mr. Bagdis' files had been seized. Yet Mr. Bagdis did not warn petitioner and Mr. Russell that filing returns with incomplete information would constitute perjury.

In the letter, Mr. Bagdis explained that petitioner could file separately and later file a joint return. He also implied that an alternative would be for the couple to continue to delay filing their returns, writing: "<u>Again</u>, with a refund, there are no real consequences to filing late". (Emphasis added.) For their previous 2 tax years, petitioner and her husband had followed Mr. Bagdis' advice and filed their tax returns late.[6] However, because in each of those years they were due a refund, they suffered no penalty for their late filing. We construe Mr. Bagdis' letter as assuring the couple that they could continue to use the same strategy with their 2001 return and that there would again be no consequences because they were due a refund.

Mr. Bagdis' letter, regardless of petitioner's lack of recollection of receiving it, fails to corroborate petitioner's testimony that Mr. Bagdis advised her that she would be committing perjury if she filed any return without incorporating the exact losses from her husband's business. Moreover, even if

---

[6]We find suspect Basement Doctor's losses of exactly $100,000 for both 1999 and 2000. Such round numbers cast additional doubt on petitioner's story that she was waiting for exact figures before filing her returns.

petitioner never received it, the fact that Mr. Bagdis did write a letter in which he stated that he had prepared "pro forma" returns based on incomplete information, in which he suggested that petitioner could file separately and then later file a joint return, and in which he again advised that there would be no consequence to filing late if petitioner was due a refund, strongly suggests that Mr. Bagdis never gave the advice petitioner claims he did.  Instead, the letter suggests another alternative that we find more plausible:  petitioner was relying on Mr. Bagdis' assurances that no tax would be due for 2001 after Basement Doctor's losses had been calculated and that she therefore need not be concerned about filing her tax return late.

II.  <u>Whether Petitioner's Reliance on Her Adviser's Advice That There Would Be No Tax Due Constitutes Reasonable Cause</u>

We find it more plausible to conclude that petitioner was relying on Mr. Bagdis' advice that no tax would be due for 2001. She had relied on his advice when filing late tax returns for the 2 prior years, and she had received a refund both times, as Mr. Bagdis had said she would.  Petitioner was, in effect, relying on a scenario that she would also be entitled to a refund for 2001. Unfortunately for petitioner, her hoped-for scenario did not materialize, and she owed tax for 2001.  As the Court of Appeals stated in <u>Jackson v. Commissioner</u>, 864 F.2d 1521, 1527 (10th Cir. 1989), affg. 86 T.C. 492 (1986):  "a presumed expert's advice concerning the amount of tax owed can be erroneous, and the

taxpayer must bear the risk of that error when he fails to comply with a known duty to file a return."  See also Estate of Hollo v. Commissioner, T.C. Memo. 1990-449, affd. without published opinion 945 F.2d 404 (6th Cir. 1991); Gore v. Commissioner, T.C. Memo. 1987-425.  As a matter of law, it was unreasonable for petitioner to file her tax return late on the basis of Mr. Bagdis' advice that no additions would be due because she would owe no tax.

III. Whether Petitioner's Reliance on Her Adviser's Advice That It Was Necessary To Have Accurate Information Constitutes Reasonable Cause

Petitioner's reliance claim includes the contention that Mr. Bagdis advised her that she should wait until she had complete information about Mr. Russell's business losses before filing her return.[7]  We have held that reliance on an attorney's advice that it was necessary to wait for complete information before filing a return does not constitute reasonable cause for a delay in filing.  Estate of Maltaman v. Commissioner, T.C. Memo. 1997-110.  Instead, taxpayers have an obligation to file a timely return with the best available information, and to file a later amended return, if necessary.  Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982).  We have held that the unavailability of information needed to calculate the tax liability does not

_____

[7]Of course, as we have discussed above, petitioner's full contention goes further and claims that Mr. Bagdis told her that if she did not wait, she would be guilty of perjury.

constitute reasonable cause for failing to file a timely return.
Crocker v. Commissioner, 92 T.C. 899, 913 (1989).  Accordingly,
insofar as petitioner relied on Mr. Bagdis' advice that she
should wait for complete information before filing her return, we
conclude that such reliance does not constitute reasonable cause.

IV.  Whether Petitioner's Reliance on Her Adviser's Advice To
     Delay Filing During the Criminal Investigation Constitutes
     Reasonable Cause

Finally, petitioner also contends that during the period
after she ceased to rely on Mr. Bagdis' advice and before she
filed her 2001 income tax return, she relied on Mr. Bergstrom's
advice not to file her return until the criminal investigation
had concluded.  It is unclear to what period petitioner contends
her defense based on reliance on Mr. Bergstrom should apply.
Although Mr. Bergstrom testified that he was concerned about the
ongoing criminal investigation and whether it might implicate
petitioner, he stated that petitioner's tax liability was not
paid until November 2006 because it took 11 months to calculate
the liability.  Mr. Bergstrom did testify that he advised her not
to file her "draft" tax return until November 2007.  However, for
purposes of section 6651(a)(1), the addition to tax for failure
to file timely reaches the statutory maximum if the delinquency

continues longer than 4 months, and the question of reliance on Mr. Bergstrom's advice is therefore irrelevant.[8]

V. Conclusion

Accordingly, we hold that petitioner is liable for the addition to tax under section 6651(a)(1) because she failed to file her 2001 tax return timely and because she has not shown reasonable cause for her failure.

The sole issues we must decide in this case are whether petitioner's failures to file timely and pay timely were due to "reasonable cause" and not "willful neglect". Sec. 6651(a)(1) and (2). We have restricted our discussion above to the issue of whether petitioner proved that she had reasonable cause for her failure to file timely pursuant to section 6651(a)(1). However, section 6651(a)(2) uses identical language to describe the standard for failure to pay. Courts considering the issue have held that the determination of "reasonable cause" under section 6651(a)(2) should receive similar analysis to that under section 6651(a)(1).[9] See E. Wind Indus., Inc. v. United States, 196 F.3d

---

[8]For purposes of the addition for failure to pay timely pursuant to sec. 6651(a)(2), the statutory maximum is reached if the delinquency continues longer than 49 months. For any month where both additions apply, the addition pursuant to sec. 6651(a)(1) will be reduced by the amount of the addition under sec. 6651(a)(2) pursuant to sec. 6651(c)(1).

[9]Financial hardship is a defense unique to the failure to pay addition to tax. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs. However, petitioner does not contend that financial

(continued...)

499, 504 n.5 (3d Cir. 1999) ("The Court's analysis in <u>Boyle</u> addressed penalties for failure to file tax returns under section 6651(a)(1). The language concerning the standard for failure to file a return is identical to the language in sections 6651(a)(2) and 6656 for failure to pay and to deposit. We see no reason why the Court's analysis under section 6651(a)(1) should not guide our analysis of sections 6651(a)(2) and 6656."); <u>Fran Corp. v. United States</u>, 164 F.3d 814, 816 n.3 (2d Cir. 1999) ("While the analysis in <u>Boyle</u> addressed penalties for failure to file a return under Section 6651(a)(1) and not for a failure to pay or deposit taxes under Section 6651(a)(2) or Section 6656, the language concerning the standard is identical in all three provisions. Unless otherwise noted, therefore, we shall inform our analysis of Sections 6651(a)(2) and 6656 with those precedents that address Section 6651(a)(1)."); <u>Valen Manufacturing Co. v. United States</u>, 90 F.3d 1190, 1193 n.1 (6th Cir. 1996) ("Although <u>Boyle</u> involved only a § 6651(a)(1) violation, the language of the 'reasonable cause' exceptions in §§ 6651(a)(2) and 6656(a) is identical and should be given the same construction.").

Therefore, for the same reasons stated above in our discussion of the addition to tax under section 6651(a)(1), we

---

[9](...continued)
hardship prevented her from timely paying her taxes.

also hold that petitioner is liable for the addition to tax under section 6651(a)(2) for failure to pay timely the taxes due for 2001.

The additions to tax should be calculated for the period from April 15, 2002, when petitioner's 2001 income tax return was due, to November 27, 2006, when she actually paid her tax liability.  Because the maximum additions to tax under both section 6651(a)(1) and (2) are reached before that date, petitioner is liable for the maximum additions under both paragraphs.

In reaching the foregoing holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.